**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WYDRICK PHILLIPS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07 C 666 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| COMMANDER JIMENEZ ALLEN, et. al. | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff has sued the Village of Bellwood, Illinois (the "Village") and seven current and former members of its police department (Officers Jiminez Allen, Miguel Herrera, Jack Bridson, Harvey Hobik, Brian Thomas, Art Johnson, and Wilson Pierce (collectively, the "Defendant Officers")) for violations of his civil rights under 42 U.S.C. § 1983, malicious prosecution under § 1983 and Illinois law, and intentional infliction of emotional distress. Plaintiff also asserts a *Monell* claim against the Village for failure to supervise, direct, and discipline its officers.

Before the Court is Defendants' motion for summary judgment on all counts of the complaint [70], as well as Defendants' motion to strike affidavits and disqualify Plaintiff's counsel [86]. For the reasons stated below, Defendants' motion for summary judgment [70] is granted as to Counts I, II and V, and the remaining state law claims (Counts III, IV, and VI) are dismissed without prejudice. Defendants' motion to strike affidavits and disqualify Plaintiff's counsel [86] is granted in part and denied in part.

## I. Background

On summary judgment, the record evidence is viewed in the light most favorable to the non-moving party—in this instance, the Plaintiff. The Court takes the relevant facts primarily

from the parties' Local Rule ("L.R.") 56.1 statements: Defendant's Statement of Facts ("Def. SOF") [71], Plaintiff's Response to Defendant's Statement of Facts ("Pl. Resp. Def. SOF") [75], Plaintiff's Statement of Additional Facts ("Pl. SOAF") [76], and Defendant's Response to Plaintiff's Statement of Additional Facts ("Def. Resp. Pl. SOAF") [90].[1]

The Robbery and Shooting at the Library

On February 2, 2005, just after 6:00 p.m., Ruby Graham, her mother Elizabeth Graham, and Ruby's young niece and nephew left Elizabeth's home to run a few errands. (Pl. Resp. Def. SOF ¶¶ 5-6). After cashing checks at a local currency exchange, including her income tax refund check, Ruby had close to $5,000 in her purse. (*Id.* at ¶ 7). The group then drove the few blocks to the Bellwood Public Library and parked in a lot near the library's south entrance. (*Id.* at ¶ 8). Ruby got out of the car and began walking toward the entrance; Ruby's mother Elizabeth remained in the parked car with the children. (*Id.* at ¶ 9; Def. Resp. Pl. SOAF ¶ 13). As she approached the library, Ruby heard the sound of a person wearing boots running behind her. (Pl. Resp. Def. SOF ¶ 9). Ruby had just stepped through the door to the library when a man snatched the purse from her left shoulder. (*Id.* at ¶ 10). Ruby turned and grabbed her attacker by his

---

[1] L.R. 56.1 requires that statements of fact contain allegations of material fact, and that the factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. See, *e.g.*, *Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider the statement. See, *e.g.*, *Malec*, 191 F.R.D. at 583. Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems admitted that statement of fact. See L.R. 56.1(a), (b)(3)(B); see also *Malec*, 191 F.R.D. at 584. The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). In addition, the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)(B) statement of additional facts. See, *e.g.*, *Malec*, 191 F.R.D. at 584 (citing *Midwest Imports*, 71 F.3d at 1317). Similarly, the Court disregards a denial that, although supported by admissible record evidence, does more than negate its opponent's fact statement—that is, it is improper for a party to smuggle new facts into its response to a party's 56.1 statements of fact. See, *e.g.*, *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008).

chest. (*Id*. at ¶ 11). The attacker was wearing a dark-colored coat. (*Id*.). Ruby grabbed her attacker three times as the pair struggled over the purse. (*Id*. at ¶ 13). During the struggle, Ruby was face-to-face with her attacker. (*Id*. at ¶ 14). Ruby told her attacker "don't do this" and the attacker called Ruby names. (*Id*.). The pair struggled through the door to the outside of the library. Ruby saw that the purse had fallen to the ground and Ruby went for it. (*Id*. at ¶ 16; Dep. of Ruby Graham, Def. Ex. 10 ("Ruby Dep."), at 142-143). As the assailant was pulling Ruby by her hood, Ruby heard Elizabeth yell "no, no, not my baby," and knew by the yelling that Elizabeth was running towards her. (*Id*. at 144-45; Pl. Resp. Def. SOF ¶¶ 15, 16). Ruby looked up from the ground and saw that her mother Elizabeth had run up and was tussling with the attacker. (Def. Resp. Pl. SOAF ¶ 14). The man pulled out a gun and shot Elizabeth in the chest, a little above her breast. (*Id*.). Ruby lunged at her attacker, who then shot Ruby in the head. (Pl. Resp. Def. SOF ¶ 20). The man said "just for that," and ran back towards Ruby's car. (Ruby Dep. at 146-147). The man reached into the car (in which the two children still sat), grabbed Elizabeth's purse, and then ran off. (*Id*.).

After the shootings, both women went into the library, (*Id*. at ¶ 22) and the police were called. While Elizabeth had been seriously injured, Ruby suffered only a graze to the temple that required a few staples to close.

Bellwood police officers responded *en masse* to the library, including Defendant Officers Allen, Herrera, Hobik, Johnson, and Pierce. (*Id*. at ¶ 24). Defendant Officer Allen was placed in charge of the investigation. (*Id*. at ¶ 25). Paramedics immediately took Elizabeth to the hospital.

<u>Ruby's Initial Descriptions of the Shooter</u>

While still at the library, Ruby was able to give a description of her attacker to an Officer who is not a defendant in this case (Officer Ibarrientos). Ibarrientos's report described the

attacker as male, black, 6'3'' in height, 180 to 190 pounds in weight, with a dark complexion, in his late 20's or early 30's, having a thin build, and oblong-shaped face, and wearing a black coat, blue jeans, and a black shirt. (*Id*. at ¶ 27). At her deposition in this case, Ruby testified that she thought Ibbarientos's description was accurate, but she does not recall telling him that her attacker was wearing a black shirt. (*Id*. at ¶ 28). Ruby later testified that it was "kind of dark" outside the library during the attack, but that there was one light that illuminated the area. (*Id*. at ¶¶ 14, 23).

Ruby followed her mother to the hospital in a second ambulance. Ruby was treated in the emergency room, and her mother was admitted. (*Id*. at ¶¶ 33,34). At around 7:30 that night, Defendant Officer Allen went to Elizabeth's hospital room, and found Ruby there. (*Id*. at ¶ 35). Ruby gave Allen another description of her attacker, telling Allen that the attacker was male, black, 6'1'' to 6'2'' in height, 180 to 190 pounds in weight, with a dark complexion, 20-30 years old, who wore a dark green quarter-length jacket, with blue jeans and a dark hat. (*Id*. at ¶ 37). At her deposition, Ruby testified that this description was accurate, except that her attacker wore a hood, not a hat. (*Id*. at ¶ 38.).

<u>Interview with Officer Allen at the Hospital</u>

The next day, February 3, 2005, Defendant Officer Allen went back to Elizabeth's hospital room. (*Id*. at ¶ 39). Ruby, Elizabeth, and Elizabeth's boyfriend at the time, James Bufkin, were in the room. (*Id*. at ¶ 40). What happened next is disputed in one key regard. What is undisputed is that Bufkin told Defendant Officer Allen that Elizabeth's son (Ruby's brother) Richard Graham told him (Bufkin) that a man named Devonte Henderson told Richard that Elizabeth's neighbor "Wydrick" told Henderson that he (Wydrick) did a robbery at a

currency exchange on Mannheim and Washington Boulevard. (*Id*. at ¶ 42).[2] However, who was present for this conversation between Allen and Bufkin is in dispute. Allen testified that he spoke with Bufkin outside of Elizabeth's room, presumably out of earshot of either Ruby or Elizabeth. (*Id*. at ¶ 41). Ruby testified at Plaintiff's trial that Allen interviewed Bufkin in Elizabeth's hospital room, while Ruby sat at the foot of Elizabeth's bed. (*Id*.). At the trial, Ruby testified that she heard Bufkin tell Allen that he'd heard that Richard and Wydrick had been talking about how they could make quick money by robbing people outside the currency exchange after they cashed their income tax checks. (*Id*.).[3]

At no time during her conversations with Allen at the hospital (or in previous discussions with police) did Ruby tell officers that she recognized her attacker or that she knew his name. (*Id*. at ¶¶ 47-48).

Photo Lineups with Ruby

Later that same day, Allen asked Ruby to come to the Bellwood police station to look at some photographs of possible offenders. (*Id*. at ¶ 49). At the station, Ruby signed a "Lineup / Photo Spread Advisory Form", which Allen had given her. (*Id*. at ¶¶ 52-54). The form stated, among other things, that: "I understand that the suspect may or may not be in the lineup / photo spread", "I understand that I am not required to make an identification", and "I do not assume that the person administering the lineup / photo spread knows which person is the suspect." (*Id*. at ¶ 53). Ruby signed the form at 4:00 p.m. (*Id*. at ¶ 54). Before signing, Ruby read the form

---

[2] Later, Allen interviewed Henderson, who denied ever talking to Richard. (*Id*. at ¶ 43). Allen was unable to locate Richard Graham. (Def. Resp. Pl. SOAF ¶ 32).

[3] At her deposition in this case, Ruby at first testified that she did not hear the conversation between Allen and Bufkin, and that she did not hear the name "Wydrick" at any time while she was in Elizabeth's hospital room. Ruby testified that the first time she heard a claim that Bufkin told Allen in her presence that Wydrick was her attacker was at Plaintiff's trial. When impeached with her trial testimony on this point, Ruby admitted that she believed her trial testimony more than her recollection at her deposition of the events in the hospital. (*Id*. at ¶¶ 44-45).

and did not have any questions about it. (*Id.* at ¶ 55). Aside from giving her the form, the only instructions Allen gave Ruby were to breathe, take her time, and to relax. (*Id.* at ¶ 56). Allen did not say where the photos he was about to show her came from, did not mention the name "Wydrick Phillips," and did not give Ruby any time constraints in looking at the photos. (*Id.* at ¶¶ 57, 58, 61).

Ruby looked through a number of sheets of photographs that Allen prepared for her. Ruby remembers looking through either five or six sheets, with each sheet containing six photos. (*Id.* at ¶ 51). Each of the photos was of an African American male. (*Id.*). When she came to the fourth or fifth sheet, Ruby recognized number six as a man who used to hang out with her brother around her mother's home. (*Id.* at ¶ 63). Ruby did not identify number six as the shooter. Ruby's attention turned towards number one and number five (who was Plaintiff) on the same sheet. Ruby lingered on number one because he had similar features and a similar complexion to the shooter, and she pointed to photo number one. (*Id.* at ¶ 64; Ruby Dep. 44:8-12; 161-164). At that point, Officer Allen said "Are you sure? Take your time." (*Id.* at ¶ 65; Def. Resp. Pl. SOAF ¶ 39).[4] Ruby did not choose number one because some of the features were different from her memory of the shooter. (Ruby Dep. at 44:8-17). Ruby then went to number five (Plaintiff) and said "that's him." (*Id.*). After Ruby picked out the photo of Plaintiff, Allen again asked "are you sure?" and "are you positive?" and Ruby said yes. (*Id.* at 49:1-7; Trial Testimony of Ruby Graham, Pl. SOAF Ex. 2, 84:19-85:4). Allen then told Ruby that "the man you just picked out lives down the street from your mother *** that's Wydrick Phillips," and that

---

[4] The only evidence that Plaintiff cites to establish that Allen asked Ruby "Are you sure? Take your time" is from Ruby's deposition in this case. Ruby testified at first that Allen did ask her these questions, but when pressed for more detail, she said she "can't say specifically" what Allen said. (Ruby Dep. at 161-164). For the purposes of this motion, the Court resolves the ambiguity in favor of the Plaintiff, and assumes that Defendant Officer Allen did pose those questions to Ruby after she pointed to individual number one.

Phillips was a friend of her brother Richard and lived eight houses down the street from her mother Elizabeth. (Pl. Resp. Def. SOF ¶¶ 66, 70; Def. Resp. Pl. SOAF ¶ 39). Allen then asked if Ruby knew the person she had just identified, and Ruby said she did not. (Pl. Resp. Def. SOF ¶ 68; Ruby Dep. at 49-51).

Ruby spent about 10-15 minutes looking through the five or six sheets of six-man composites, and looked at the sheet containing Plaintiff's photo for less than five minutes before identifying him. (Ruby Dep. at 45:13-24).

While Ruby was still at the police station, Allen received an anonymous phone call from someone who told him an individual named "Jabari Nicks" had committed the robbery and shooting. (Pl. Resp. Def. SOF ¶ 76). Allen then told Ruby that he had gotten a phone call and wanted her to look at some more photographs. (*Id*. at ¶ 78). Ruby signed a second "Lineup / Photo Spread Advisory Form" at 5:40 p.m. (*Id*. at ¶ 79). Allen gave Ruby a sheet with five color photographs, which included a picture of Jabari Nicks but did not include a picture of Plaintiff. (*Id*. at ¶ 81). Ruby did not identify anyone in the second photo array as the shooter, and viewing the second array did not change Ruby's opinion about her prior identification of Plaintiff. (*Id*. at ¶¶ 81, 83, 84).

Around this same time, Officer Herrera received another anonymous phone call from a person who told him that a 52-year-old man named "Marty S. Baxter" was involved in the shooting. (*Id*. at ¶¶ 85-86). The police did not investigate this lead. (*Id*. at ¶ 86). Finally, at about 9:30 p.m. that same day, a Bellwood police dispatcher received an anonymous phone call from a person who said that a "Cornelius Woods" was involved. None of the Defendant Officers followed up on this tip either. (*Id*. at ¶¶ 89-90).[5]

---

[5] In his response to Defendants' statement of facts, Plaintiff submits that the calls about Jabari Nix and Marty S. Baxter came in *before* Ruby picked Plaintiff out of the photo lineup. However, the evidence to

<u>Plaintiff is Arrested, Tried, and Acquitted</u>

Police arrested Plaintiff sometime between 12:00 and 1:00 a.m. on the morning of February 4th, 2005. Plaintiff alleges that after he was arrested, Allen told Plaintiff that he was not going home because "they just need a body." (Pl. SOAF ¶ 60-61). Plaintiff believes that he was framed, arrested, and prosecuted because of pressure that the Bellwood Police Department felt to arrest someone for the crime. (*Id.*).

Plaintiff's trial took place in late September to October 2006. Plaintiff was found not guilty at the trial in October of 2006. (Pl. Resp. Def. SOF ¶ 185).

## II.     **Legal Standard on Summary Judgment**

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is

---

which Plaintiff cites establishes only that the calls started coming in (beginning with the Jabari Nix call) at around 4:30 p.m.—30 minutes after Ruby arrived at the station and signed the first Lineup / Photo Spread Advisory Form. By 4:30 p.m., Ruby already had identified Plaintiff. (Ruby Dep. at 45:13-24; Def. SOF, Ex. 20 Motion to Suppress Testimony of Officer Allen at 43).

proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III. Analysis

### A. Probable Cause Existed for Plaintiff's Arrest

Plaintiff brings a § 1983 claim for false arrest, false imprisonment, and malicious prosecution in violation of the Fourth Amendment against the Defendant Officers. To prove a claim under § 1983 against the officers, Plaintiff must show that a person acting under color of state law deprived him of a right, privilege, or immunity secured either by the Constitution or federal law. See, *e.g. Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982). The Defendant Officers do not dispute that they were acting under color of state law at the time of Plaintiff's arrest. Rather, they argue that Ruby's identification of Plaintiff in the photograph lineup established probable cause for Plaintiff's arrest. The Court agrees.[6]

"Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution." *Mustafa v.*

---

[6] As an initial matter, Defendants argue that Plaintiff is collaterally estopped from litigating the issue of whether probable cause existed for his arrest because at the suppression hearing before Plaintiff's trial, the judge specifically found that probable cause existed. Defendants abandon this argument in their reply brief. In any event, as Defendants recognize, the Seventh Circuit has interpreted Illinois law to hold that collateral estoppel does not bar an acquitted criminal defendant from challenging a pre-trial determination of probable cause in a subsequent § 1983 action. *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1021 (7th Cir. 2006) (reasoning that an acquitted defendant is limited in his or her ability to test the correctness of the trial court's ruling through appellate review); see also *Lyttle v. Killackey*, 546 F.Supp. 2d 583, 588-590 (N.D. Ill. 2008).

*City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006) (citing *Potts v. City of Lafayette*, 121 F.3d 1106, 1113 (7th Cir.1997)). "This is so even where the defendant officers allegedly acted upon a malicious motive." *Id.* (citing *Simmons v. Pryor*, 26 F.3d 650, 654 (7th Cir.1993)).

Police officers have probable cause to arrest an individual when "the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed" an offense. *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir.1998). The court evaluates probable cause "not on the facts as an omniscient observer would perceive them," but rather "as they would have appeared to a reasonable person in the position of the arresting officer—seeing what he saw, hearing what he heard." *Id.*; see also *Woods v. City of Chicago*, 234 F.3d 979, 987 (7th Cir. 2000); *United States v. Reis*, 906 F.2d 284, 289 (7th Cir. 1990) (courts determine the existence of probable cause by applying an objective standard; it is the mindset of the "reasonable officer" and not of the actual arresting officer that matters). The test, an objective one, is whether a reasonable officer would have believed the person had committed a crime. If the test is satisfied "the arrest is lawful even if the belief would have been mistaken." *Kelly*, 149 F.3d at 646. Thus probable cause has been described as a zone within which reasonable mistakes will be excused. *Id.*

Once a reasonably credible witness informs an officer that a suspect has committed a crime, the police have probable cause to arrest the suspect. See, *e.g* .*Woods*, 234 F.3d at 987; *Kelley*, 149 F.3d at 647; *Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998); *Grimm v. Churchill*, 932 F.2d 674, 675 (7th Cir. 1991) ("As we have previously held, [w]hen an officer has received his information from some person – normally the putative victim or an eye witness – who it seems reasonable to believe is telling the truth, he has probable cause.") (internal

quotations omitted); *Jones v. Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) (stating that an identification given by a "lucid" victim would establish probable cause). In the context of a photographic identification, when the victim "points to a picture and cries, 'That's the one!', the 'reasonable and prudent' person *** will naturally tend to believe that the person so identified is guilty." *Yattoni v. Oakbrook Terrace*, 801 F. Supp. 140, 146 (N.D. Ill. 1992). Even a single photographic identification by a reliable eyewitness or victim may be sufficient to supply probable cause. *Id.* (citing *Grimm*, 932 F.2d at 675).

However, an unduly suggestive photographic array or in-person lineup may not be used to establish probable cause. See *Yattoni*, 801 F. Supp. at 147; *Neal v. City of Harvey*, 1 F. Supp. 2d 849, 855 (N.D. Ill. 1998). In *Yattoni*, Judge Shadur observed that an "unduly suggestive lineup or photospread may confirm the police's prior suspicions about a person, but it is not likely to provide an unbiased reflection of the witness's personal knowledge." *Id.* Probable cause cannot be based on such an identification because "the police cannot claim to have learned anything from a selection foreordained by their own conduct." *Id.* There is, however, an exception to the rule prohibiting the use of an unduly suggestive identification to establish probable cause. An unduly suggestive identification may still establish probable cause if, given the totality of the circumstances, the identification was reliable. See, *e.g. United States ex. rel. Hudson v. Brierton*, 699 F.2d 917, 923-24 (7th Cir. 1983). Factors to be considered when determining whether an identification is reliable are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199 (1972). The primary purpose of the test is to consider whether "a very substantial

likelihood of irreparable misidentification" existed. *Id*. at 198; see also *Simmons v. United States*, 390 U.S. 377, 384 (1968).

As an initial matter, after Ruby picked Plaintiff's photo out of the lineup and Plaintiff was arrested, two more identifications took place: Ruby picked Plaintiff out of an in-person lineup and Elizabeth picked Plaintiff out of a photo lineup from her hospital bed. These identifications took place *after* Plaintiff had been taken into custody. Plaintiff spends much time discussing purported flaws with these identifications. However, events which occurred after the arrest are irrelevant to the determination of whether probable cause existed for the arrest. See, *e.g. Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 745 (7th Cir. 2003) (rejecting plaintiff's reliance on events that occurred after arrest as basis for argument that there was no probable cause); *Maltby v. Winston*, 36 F.3d 548, 557 (7th Cir. 1994) (any evidence that "came to light after the arrest is not relevant to the probable cause inquiry"). Similarly, Defendant Officers' actions (or lack thereof) regarding the three anonymous tips that they received do not affect the probable cause determination. As explained below, Ruby's identification of Plaintiff's photo established probable cause for Plaintiff's arrest. Police received the anonymous phone calls after Ruby made the identification. Once police officers "have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence." *Schertz v. Waupaca County*, 875 F.2d 578, 583 (7th Cir. 1989) (citing *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979)); *Kompare v. Stein*, 801 F.2d 883, 890 (7th Cir.1986) ("the law appears to be ... that the police ... have no constitutional duty to keep investigating a crime once they have established probable cause").

In response to Defendants' argument that Ruby's identification of Plaintiff out of the photo array established probable cause, Plaintiff argues that there is "substantial evidence from

which a reasonable jury can conclude that the defendants, and, in particular, defendant Allen engaged in acts designed to cause the victims to identify Wydrick Phillips as the perpetrator." The core of Plaintiff's argument is that during Defendant Officer Allen's visit to Elizabeth's hospital room on February 3, 2005, Allen erred by interviewing Bufkin in the presence of Ruby and Elizabeth. For the purposes of this motion, the Court assumes (as it must) that Plaintiff's version of the facts is correct—that Ruby did overhear Bufkin say that he heard Wydrick Phillips was the perpetrator. Plaintiff points to evidence in the record which suggests that Plaintiff was known to both Elizabeth and Ruby, since Plaintiff grew up on the block where Elizabeth lived. Plaintiff's theory is that Ruby's subsequent photo identification of Plaintiff was tainted by her familiarity with Plaintiff and what she overheard—she heard the familiar name "Wydrick" and therefore knew to look for his picture in the composite.

For a number of reasons, the Court respectfully rejects Plaintiff's argument. Again, the relevant analysis focuses on the facts and circumstances within the arresting officer's knowledge; it does not focus on the facts known to witnesses or victims or on "the facts as an omniscient observer would perceive them." *Kelley*, 149 F.3d at 646. Construing the facts in the light most favorable to Plaintiff, at the time that Allen conducted the photo lineup, he knew that Ruby had overheard Bufkin mention Plaintiff's name, and knew that there was a chance Ruby knew Plaintiff, since Bufkin had mentioned that Plaintiff was Elizabeth's neighbor and associated with Ruby's brother Richard. But any concern that Allen may have had that the Bufkin interview tainted Ruby's identification would have been dispelled when Ruby affirmatively told Allen, after picking out Plaintiff's photo, that she did not recognize the name "Wydrick Phillips" and did not know the individual whom she had picked out.[7] Accordingly, a reasonable jury could not

---

[7] Further, there is no evidence in the record to suggest that Allen should have harbored a suspicion that Ruby's pronouncements that she did not know her attacker were untrue. In fact, Plaintiff admits that

find that, at the time Plaintiff was arrested, Officer Allen would have believed that Ruby's identification had been "tainted" in any way by her exposure to the Bufkin interview.[8]

While Plaintiff does provide evidence that interviewing one witness in the presence of another is bad practice, he cites no case which finds that when a witness overhears a familiar name being discussed as a suspect, that alone so poisons the witness's mind so as to preclude her from making a reliable identification. The Court's own research similarly did not uncover any such case. To the contrary, the law is settled that even when a police officer has employed flawed or otherwise suggestive procedures in a lineup, an identification can still form the basis for probable cause when, given the totality of the circumstances, the identification was reliable. *United States ex. rel. Hudson*, 699 F.2d at 923-24.

The Court next considers the procedures employed in the photographic lineup itself and finds that they were not unduly suggestive. Authorities conducting lineups are required to make reasonable efforts under the circumstances to conduct a fair and balanced presentation. *United States v. Traeger*, 289 F.3d 461, 474 (7th Cir. 2002). Under the circumstances here, the efforts undertaken by Defendant Officer Allen more than met the standard. The six-man composite tendered to the Court shows that Allen chose photos of African American men with similar ages, features and complexions as Plaintiff's. See *id.* (officers "not required to search for identical twins in age, height, weight, or facial features" in conducting lineups). Furthermore, Ruby viewed either 30 or 36 photos. Lineups of far fewer individuals have been found sufficient. See,

---

Allen never suspected that Ruby's identification of Plaintiff as her attacker was based on a false motive or purpose. (Pl. Resp. Def. SOF ¶ 146).

[8] For his part, Plaintiff points to evidence in the record that purportedly establishes that Ruby *did in fact* know Plaintiff directly at the time of the shooting. For example, Plaintiff testified in his deposition that he changed a tire on Ruby's car approximately one week before the shooting. (Pl. SOAF ¶ 36). Because there is no evidence that these facts were known to Allen or the other Defendant Officers at the time of the arrest, they are immaterial to the probable cause analysis.

*e.g. United States v. Funches*, 84 F.3d 249, 253 (7th Cir. 1996) (five participants sufficient); *United States v. Carter*, 410 F.3d 942, 948 (7th Cir. 2005) ("Six is a sufficient number of photos for such a line-up."). There is no evidence in the record that Defendant Officer Allen affirmatively encouraged Ruby to select Plaintiff or mentioned Plaintiff's name at the time of the lineup. There is no evidence that Allen rushed Ruby; in fact he only told her to breathe, relax, and take her time.

Plaintiff identifies three purported flaws in the procedures employed during the photo lineup. Plaintiff first argues that Allen "engineered" Ruby's identification of Plaintiff when, in presenting the composites to Ruby, he asked Ruby "did she see anybody in there that she saw before." (Def. Resp. Pl. SOAF ¶ 38). Plaintiff does not specify exactly what problem he has with that question, but the Court presumes that Plaintiff finds it to be improper because Plaintiff's theory is that Ruby was in fact familiar with Plaintiff and had seen him before. Perhaps the question would have been clearer if Allen had asked Ruby whether she could "pick out the man who shot you and your mother." But whichever way Officer Allen worded his instruction, there is no evidence in the record that suggests Ruby was confused about her task— she was being shown the photo lineup in order to pick her assailant, not to identify all the faces she may have recognized. That Ruby did in fact recognize one of the photos (number six) as a man who used to hang out with her brother and did not finger him for the crime is evidence that Ruby understood her assignment. Furthermore, reading a few lines ahead in the very same testimony that Plaintiff cites removes any doubt about the clarity of Officer Allen's instructions:

> Q: How did you word it?
> Allen: I asked her did she see anybody in there that she saw before. (Def. SOF, Ex. 20 Motion to Suppress Testimony of Officer Allen at 44:21-22).
>                                        * * *
> Q: Did the lady tell you that she pointed to Wydrick Phillips because she saw him before?

Allen:  She pointed towards him and I asked her what did he do and she explained to me what he did.

Q:  What did she tell you he did?

Allen:  She told me he was the one that robbed her at the library on the 2nd, shot her in the head and shot her mother in the chest and took her purse.  (*Id.* at 45:5-13).

Next, Plaintiff takes issue with the fact that Officer Allen told Ruby "are you sure?" and "take your time" after she pointed to individual #1 (who was not Plaintiff) on one of the composites.  In *McGowan v. Miller*, the Seventh Circuit considered a nearly identical fact pattern—a witness hurriedly pointed to one photograph, was asked by a detective "Are you sure?", looked closer, and then picked out the defendant.  109 F.3d 1168, 1174-75 (7th Cir. 1997).  The Seventh Circuit found that the question was not suggestive or improper; the detective had wanted to ensure the accuracy of the witness's selection rather than push her towards a particular suspect.  *Id.*  Here, the evidence does not suggest that Allen asked Ruby if she "was sure" in order to prod her to choose Plaintiff.  First, for what it's worth, Ruby never "chose" individual #1, instead she pointed to him because he had similar features to her attacker.  But more importantly, Allen asked the same confirmatory questions of Ruby *after she identified Plaintiff*.  If Allen's questions were meant to encourage her to select Plaintiff, why would he ask Ruby if she was "sure" and if she was "positive" after the desired result had been reached?  Without more, as a matter of law, Defendant Officer Allen's statements to Ruby during the lineup were not unduly suggestive.  See *id.* (noting that "[r]emarks that were far more suggestive than" the question "are you sure?" have been held permissible within the standards of due process) (citing *United States v. Moskowitz*, 581 F.2d 14 (2d Cir. 1978) (witness' viewing of photographs of a six-person lineup, after being told that her original choice was an FBI clerk and that the other two witnesses selected the "right" individual was not unduly suggestive)).

Last, right after Ruby picked Plaintiff, Allen informed her that she had picked Wydrick Phillips, that he lived down the street from her mother, and that he was a friend of Ruby's brother. Plaintiff argues that the purpose of telling Ruby this information was to "reinforce" Ruby's selection after the fact by telling her she had picked Wydrick Phillips, which was the name she had heard in the hospital. In *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1047 (7th Cir. 2003), the Seventh Circuit considered a similar argument made by a habeas petitioner. There, the petitioner argued that police officers "appeared happy or excited" after witnesses selected petitioner, "thus improperly reinforcing [the witnesses'] identifications." *Id*. In finding the officers reactions not unduly suggestive, the court stressed the fact that the reactions of course occurred *after* the identifications had been made. *Id*. It is difficult to see how an officer's post-identification conduct could affect the reliability of the identification itself. See, *e.g. Love v. Young*, 781 F.2d 1307, 1310 n.1 (7th Cir. 1985) (photo lineup not unduly suggestive where potentially suggestive procedure occurred *after* identification already made).

In any event, Defendants argue that even if the Ruby's mind was somehow tainted by overhearing Plaintiff's name, or that if the procedures Allen employed during the photo lineup *were* unduly suggestive, the totality of the circumstances as established by the undisputed material facts show that Ruby's identification was reliable. The Court agrees: Even if there were flaws in the way Ruby's identification was produced, the totality of the circumstances shows that Ruby's identification was sufficiently reliable to create probable cause. *United States ex. rel. Hudson*, 699 F.2d at 923-24; *Mikel v. Thieret*, 887 F.2d 733, 738 (7th Cir. 1989) (victim's identification of suspect in a photo lineup after seeing suspects picture in the newspaper, even if the product of an unduly suggestive procedure, did not, under the totality of the circumstances, create a substantial likelihood of misidentification).

Reliability of an eyewitness identification is to be determined by considering the totality of the circumstances, with special reference to the five *Biggers* factors.  *Biggers*, 409 U.S. at 199-200).  First, Ruby had a good opportunity to view her attacker.  Before she was shot, Ruby struggled with the assailant and was face to face with him.  Although Ruby testified that it was unusually dark outside the library during the attack, she also testified that there was a light which illuminated the area.[9]  Next, as the victim of a heinous crime, Ruby's degree of attention to the assailant was undoubtedly high.  See *Biggers*, 409 U.S. at 201 (rape victim giving identification testimony "was no casual observer, but rather the victim of one of the most personally humiliating of all crimes"); see also *Poole v. Godinez*, 12 F.3d 1101, 1993 WL 473670, at *4 (7th Cir. Nov. 17, 1993) (unpublished opinion) (victim of armed robbery's attention would be expressly drawn to her assailant).  Ruby's descriptions of her attacker were both thorough and generally consistent over time.  The evidence shows that Ruby considered either 30 or 36 photographs.  Although her attention lingered on a picture of an individual with similar features to Plaintiff, once Ruby identified Plaintiff, she expressed no uncertainty about her choice.  When asked by Officer Allen if she was "sure" and if she was "positive," she replied unequivocally that she was.  Through her testimony at trial Plaintiff's criminal trial to her deposition in this case, Ruby unequivocally has maintained that Plaintiff was the one who attacked her.  See, *e.g.* (Pl. Resp. Def. SOF ¶ 147).  Finally, the time between the crime and Ruby's identification of Plaintiff was short—less than 24 hours.  Courts have held that gaps of weeks and even months between a crime and a first identification do not necessarily render and identification unreliable. See, *e.g. Biggers*, 409 U.S. at 201 (lapse of seven months between rape and confrontation).

---

[9] Elizabeth testified in her deposition in this case that as she ran towards her daughter, it was "too black" to see the assailant clearly.  At her deposition, Ruby testified that typically, three lights illuminated the area outside the library's south entrance, but on that night only one was on.  However, Ruby never testified that it was too dark from her vantage point to see her attacker's face.

Because probable cause to arrest Plaintiff existed, summary judgment on Plaintiff's claims for wrongful arrest and false imprisonment (Count I) is appropriate.[10]

### B. Defendants are Entitled to Summary Judgment on Plaintiff's Claims for Malicious Prosecution Under § 1983

In Count II (titled "Malicious Prosecution Under § 1983"), Plaintiff alleges that the Defendants "in continuing to arrest and seize Plaintiff without probable cause, right or reason, and then to continue to prosecute him caused Plaintiff to be deprived of liberties guaranteed to him by the 4th and 14th Amendments." To the extent Plaintiff is alleging here that Defendants denied him due process by causing him to suffer a "deprivation of liberty from a prosecution and a contrived conviction" his claim is, in essence, one for malicious prosecution, rather than a due process violation. *McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003). As the Seventh Circuit emphasized in *Newsome v. McCabe*, 256 F.3d 747, 750 (7th Cir. 2001), "the existence of a tort claim under state law knocks out any constitutional theory of malicious prosecution *** because the due process of law is afforded by the opportunity to pursue a claim in state court ***"). See also *Parish v. City of Chicago*, 594 F.3d 551 (7th Cir. 2009). And Illinois law provides a state remedy for malicious prosecution. See *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (1996). Accordingly, Count II is knocked out to the extent that it is duplicative of Count III.

To the extent that Plaintiff is alleging that Defendants violated his substantive due process rights by "railroading" him by failing to disclose evidence to prosecutors, falsifying evidence, and conspiring to frame him, Plaintiff is merely "combining what are essentially

---

[10] One last point: Plaintiff alleges that he was intentionally framed by Defendants because they "just need[ed] a body" to prosecute. Summary judgment is appropriate whether or not this is true, as probable cause is an absolute defense even if the defendant officers allegedly acted upon a malicious motive. *Simmons*, 26 F.3d at 654.

claims for false arrest under the Fourth Amendment and state law malicious prosecution into a sort of hybrid substantive due process claim under the Fourteenth Amendment," a practice that the Seventh Circuit has specifically and repeatedly denounced. See, *e.g. Brooks v. City of Chicago*, 564 F.3d 830, 833 (7th Cir. 2009); *McCann*, 337 at 786. Either way, the "malicious prosecution" theory articulated in Count II fails.

### C. Plaintiff's *Brady* Claim

In Count I of his complaint, Plaintiff alleges that the Defendants violated his civil rights "without due process of law" when Plaintiff was "falsely arrested, falsely imprisoned, and subjected to great duress." (Cmplt. ¶ 56). In their motion for summary judgment, Defendants interpreted Count I as asserting both a claim for false arrest / false imprisonment and (perhaps appreciating the nature of the evidence in the case) as a due process claim based on a series of *Brady* violations allegedly committed by the Defendants. In his response brief, Plaintiff somewhat quizzically argues that Count I was indeed intended only to raise a false arrest / false imprisonment claim, not a claim for violation of Plaintiff's right to a fair trial. (Pl. Resp. at 15). However, this statement comes after Plaintiff spends pages laying out the facts of what he terms are a "series of *Brady* violations in which evidence indicative of innocence was withheld from plaintiff's trial counsel." (Pl. Resp. at 10). Nowhere in Plaintiff's brief does he clarify where in the complaint he intended to raise a *Brady* claim. In fact, nowhere in the brief does Plaintiff lay out the legal standards for a *Brady* claim or explain how Defendants' actions amount to one. Failure to properly develop an argument with citation to relevant legal authority constitutes a waiver. See, *e.g.*, *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 964 n. 1 (7th Cir. 2004) ("We have repeatedly made clear that perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even when those arguments raise constitutional issues)."); *United States v. Amerson*, 185 F.3d 676, 689 (7th Cir. 1999) ("[G]iven

our adversarial system of litigation, it is not the role of this Court to research and construct legal arguments open to the parties, especially when they are represented by counsel."). It is not the role of the Court to "scour a record to locate evidence supporting a party's legal argument" or to "research and construct the parties' arguments," see, *e.g.*, *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005); *LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 921-22 (7th Cir. 1997), as the Court here was required to do in order to construct Plaintiff's *Brady* claim.[11]

However, in the interest of construing the papers submitted by Plaintiff in the light most favorable to him, and because Defendants managed to cobble together a response to Plaintiff's *Brady* theories, the Court assumes that Plaintiff did in fact intend to raise a *Brady*-type violation. Regardless, the Court concludes that summary judgment is appropriate for any *Brady*-type claims that Plaintiff made or could have made.

In *Newsome*, the Seventh Circuit held that "[d]ue process claims against the police alleging the withholding of evidence should be analyzed under the framework set forth in *Brady v. Maryland*, 373 U.S. 83 (1963)." 256 F.3d at 752. While most commonly viewed as a prosecutor's duty to disclose to the defense, the duty implicated in *Brady* extends to the police and requires that they similarly turn over exculpatory/impeaching evidence to the prosecutor, thereby triggering the prosecutor's disclosure obligation. See *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) ("[A] *Brady* suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor ***.'"). In

---

[11] The Court recognizes that a party opposing summary judgment does not need to cite additional legal authority, provided that the argument depends on the application of facts to well-established legal standards already presented in the moving party's brief. See *Davis v. Carter*, 452 F.3d 686, 692 (7th Cir. 2006). Whether the standards applying to an *acquitted* individual attempting to make a claim for damages is "well established" is not at all clear. However, this exception does not excuse a party from its responsibility to marshal its facts in such a way as to show the Court why the relevant legal standards have been met. See also *Malec*, 191 F.R.D. at 586 ("the analysis section should contain a review of the relevant legal standards supported by citation to caselaw and a thorough application of that law to the specific facts of the case").

order to establish the elements of a *Brady*-type due process claim, a plaintiff must demonstrate that (1) the evidence at issue is favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued—in other words, "materiality." *Parish*, 594 F.3d at 554 (citing *Carvajal v. Dominguez*, 542 F.3d 561, 566-67 (7th Cir. 2008)). Evidence is suppressed for *Brady* purposes when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence. *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002) (citing *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001)). Evidence is "material" "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Carvajal*, 542 F.3d at 567. When determining whether there is a reasonable probability of prejudice, "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). In performing the materiality analysis, courts are to consider the cumulative effect of all the suppressed evidence, as opposed to considering each piece alone. See *Goudy v. Basinger*, 604 F.3d 394 (7th Cir. 2010) (discussing *Kyles*, 514 U.S. 419). Although the Seventh Circuit has expressed doubts about whether a section 1983 plaintiff who has been acquitted at his criminal trial can ever establish prejudice, in previous cases, the Seventh Circuit has analyzed potential claims in order to determine if the decision to go to trial would have been altered by the suppressed evidence. *See Carvajal* 542 F.3d at 569; *Bielanski v. County of Kane*, 550 F.3d 632, 645 (7th Cir. 2008). Thus, Plaintiff (who was acquitted) *may* still in theory have had a *Brady*-

type due process claim if prompt disclosure of the suppressed evidence would have altered the prosecution's decision to proceed to trial. *Id*.

>    1.    **The Bulk of the Evidence That Plaintiff Identifies was Not Suppressed**

On pages 10-14 of his brief, Plaintiff provides a laundry list of purported "*Brady* violations." As an initial matter, the Court has considered each allegation on Plaintiff's list and finds the vast bulk of the evidence that Plaintiff identifies was not in fact "suppressed" within the meaning of *Brady* and its progeny. First, the record shows that many of the allegedly withheld pieces of evidence were in fact eventually "ferreted out" (in Plaintiff's words) by Plaintiff's attorneys in time for them to make use of it trial. In fact, Plaintiff admits as much. (Pl. Resp. at 11) ("[Some of Defendants' acts] were unmasked by plaintiff's criminal counsel and, thus, may no longer be actionable *Brady* violations."). Allegedly suppressed evidence uncovered in time for the defendant to make effective use of it at trial does not support a claim for a *Brady* violation, even if provided late in the game or during trial. See, *e.g. Bielanski*, 550 F.3d at 645. Some of Plaintiff's alleged bases for the *Brady* claim involve Allen's failure to report to the prosecutor that the identifications by Ruby and Elizabeth were flawed (either because Allen allegedly used suggestive procedures, because Elizabeth admitted she got a poor view of the attacker, or because of the taint from the Bufkin interview). The record clearly shows that Plaintiff (through his attorneys) took full advantage of his opportunity to examine Ruby, Elizabeth, Allen, and other Defendant Officers about the all aspects of the various photo identifications and the physical lineup both at trial and at the suppression hearing. See (Pl. Resp. Def. SOF ¶¶ 150 – 157; 164 – 184). Similarly, evidence regarding the "Marty S. Baxter" tip was not suppressed. Allen included information about the call in his police report and counsel for Phillips did question the Defendant Officers about this and the other anonymous tips at the

suppression hearing and at trial. See, *e.g.* (Pl. Resp. Def. SOF ¶¶ 157, 158, 171, 172, 174, 175).

Plaintiff also was well aware of Allen's and the other Defendant Officers' treatment of Plaintiff's

tan-colored coat, and their alleged efforts to convince Ruby that it could appear dark in the right

lighting conditions. That argument in fact formed one of the bases for Plaintiff's motion to

suppress. Plaintiff does not argue (nor is there any evidence in the record to support such an

argument) that Plaintiff was hindered in any way from presenting a full defense on any of these

topics.[12]

Other of the allegations attempt to pin a *Brady* violation on Officer Allen's alleged false

statements to ASA Coakley. See, *e.g.* Pl. Response at 10 ("Allen falsely told Coakley that

plaintiff was arrested wearing a jacket that looked like the jacket worn by the offender as shown

in a library security video."). Those claims fail, for the Seventh Circuit specifically has held that

"*Brady* does not extend so far as to provide relief in a situation where a police officer makes a

false statement to a prosecutor." *Carvajal*, 542 F.3d at 567 (citing *Harris v. Kuba*, 486 F.3d

1010, 1017 (7th Cir. 2007)); see also *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003).

### 2. Evidence Sent to the Crime Lab

Next, there is the matter of certain evidence submitted to the Illinois State Police Crime

Laboratory for testing. The first issue involves fingernail scrapings taken from Ruby the night of

the attack. (Pl. Resp. Def. SOF ¶ 160). Soon after he was charged, Assistant State's Attorney

Scott Clark filed a Motion for Buccal Swab Samples from Plaintiff, and Plaintiff agreed to the

---

[12] Furthermore, any details of the foregoing that were not disclosed either came out during cross examination of Ruby, Elizabeth, and the other witnesses (including various of the Defendant Officers) or, with Plaintiff's level of knowledge of the crucial facts in mind, could have through the exercise of reasonable diligence. Evidence is not suppressed if it is "otherwise available to the defendant through the exercise of reasonable diligence." *O'Hara*, 301 F.3d at 569 (citing *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir.2001)); *Carvajal*, 542 F.3d at 567 (evidence not suppressed when witnesses presence at suppression hearing gave counsel the opportunity to "probe the witnesses and investigate their versions of the relevant events").

DNA sampling. (*Id*. at ¶ 162). Allen took the DNA swab, (*id*. at ¶ 163), but there was a delay in having the DNA samples tested by the laboratory. The lab eventually reported that the samples did not match. (However, it must be kept in mind that there is no evidence in the record that Ruby ever scratched her assailant or touched any part of his person other than his coat.) The lab reports memorializing this finding were not made until after Plaintiff was acquitted. However, it appears that Plaintiff may have learned the results of the tests from a verbal report made in court by the State's Attorney during the trial. (Allen Dep. at 69:20-24). Like the evidence discussed above, the Court finds that the results of the DNA test were not suppressed. Chiefly, the reports themselves were not created until after Plaintiff was acquitted; accordingly, there was no physical report to turn over prior to or during trial. Additionally, the record suggests that Plaintiff's counsel may have learned the results of the test in time to make use of them at trial.

The next issue involves the tan-colored coat that Plaintiff was wearing when he was arrested. Although Defendant Officer Allen had Plaintiff's coat under police inventory since the night of the arrest, Allen did not send the coat to the crime laboratory for gunpowder residue testing until September 25, 2006, when Plaintiff's trial was underway—19 months later. (Def. Resp. Pl. SOAF ¶ 98). A report dated September 28, 2006 concluded that the coat had not been in the environment of a discharged firearm. (*Id*.). It is unclear whether Plaintiff's counsel learned of the results of this test during Plaintiff's trial.

The third issue is the matter of two anonymous letters received by Ruby while Plaintiff was in custody awaiting trial. Ruby provided the letters to police sometime in advance of trial. The first letter was examined by the crime lab on February 9, 2006. It threatens Ruby and advises her to "just stick to your story he was a good fall guy." The second letter was examined on February 27, 2006, and purports to be from the actual assailant. It reads in part "I robbed you

and you robbed [Plaintiff] his family and the system." Police never provided the letters or the lab reports which discussed them to defense counsel. ASA Clark never knew about the letters. On November 27, 2006 (after Plaintiff was acquitted) a lab report examining fingerprints found on one of the letters concluded that they did not match Plaintiff's fingerprints.

Again, to recover on a claim for a *Brady*-type deprivation of due process, Plaintiff must prove that (1) the evidence at issue is favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued—in other words, "materiality." *Parish*, 594 F.3d at 554. Both the anonymous letters and the results of the gunpowder residue tests were clearly favorable to Plaintiff. While it is not entirely clear that both pieces of evidence were suppressed, the Court assumes for the purposes of this motion that they were. Plaintiff's *Brady* claim fails however, because no reasonable jury could conclude that the letters and the results of the residue test were "material"—in that "there is a reasonable probability that, had the evidence been disclosed to the defense", *Carvajal*, 542 F.3d at 567, "the decision to go to trial would have been altered." *Mosley v. City of Chicago*, 2010 WL 2943907 (7th Cir. July 29, 2010) (citing *Bielanski*, 550 F.3d at 645). The favorable evidence simply could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the outcome." *Carvajal*, 542 F.3d at 568 (quoting *Kyles*, 514 U.S. at 435).

ASA Coakley testified in her deposition that her decision to proceed to trial was based in large part on the strength of Ruby's (and Elizabeth's) identifications of Plaintiff. (Pl. Resp. Def. SOF ¶¶ 143, Coakley Dep. at 29:8-12). The evidence that Plaintiff identifies would have had absolutely no effect on the strength of the identifications, especially Ruby's. The anonymous letters (which Plaintiff must admit could have been sent by anyone) have limited evidentiary

value.  That the coat Plaintiff was wearing when he was arrested (which Plaintiff has consistently maintained was not the coat worn by the shooter) did not test positive for gunpowder residue is not strong exculpatory evidence in Plaintiff's favor.  No reasonable jury could conclude that the withheld evidence was "of the nature to cause a prosecutor to drop the charges entirely."  See *Bielanski*, 550 F.3d at 645; see also *id.* (upholding dismissal of *Brady* claim because "earlier disclosure of this evidence would not have resulted in dismissal of the charges prior to trial" when "[f]or the most part, the evidence is impeaching rather than exculpatory" and only "weakened parts of the prosecution's case but was not the type of evidence that would have precluded the charges entirely"); *Carvajal*, 542 F.3d at 567 (reversing denial of motion for summary judgment on *Brady*-type claim when the nature of the allegedly-withheld evidence showed no "reasonable probability" that the charges would have been dropped).  This conclusion is bolstered by the extraordinarily high standard of prejudice that an *acquitted* § 1983 plaintiff must show in order to prove a claim—in essence, that in the absence of the suppressed evidence, Plaintiff did not receive a "fair trial," which means "a trial resulting in a verdict worthy of confidence."  *Id.*  (quoting *Kyles v. Whitley*, 514 U.S. 419, 434).[13]  For all of these reasons, summary judgment in favor of the Defendants is appropriate on Plaintiff's *Brady* claim, to the extent that Plaintiff intended to assert such a claim.

### D.     Plaintiff's *Monell* Claim

There is no vicarious liability under *respondeat superior* against a government entity for the acts of its employees.  *Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 120 (1992).  Congress did not intend a municipality to be liable unless the action complained of was done

---

[13] In fact, even if all of the evidence that Plaintiff identifies as having been withheld (including the evidence discussed in Section A above) were indeed suppressed, the Court would still find that the cumulative effect of the withheld evidence would not rise to the level of materiality required for an acquitted defendant to succeed on a *Brady*-type claim.

pursuant to official municipal policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy. *Monell v. New York City Department of Social Services*, 436 U.S. 665, 694 (1978); see also *Collins*, 503 U.S. at 120-121, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 477 (1986); *City of Canton v. Harris*, 489 U.S. 378 (1989); *Bd. of Cty. Comm. of Bryan Cty., OK v. Brown.*, 520 U.S. 397 (1997). "Misbehaving employees are responsible for their own conduct[;] 'units of local government are responsible only for their policies rather than misconduct by their workers.'" *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (quoting *Fairley v. Fermaint*, 482 F.3d 897, 904 (7th Cir. 2007)).

A plaintiff can establish a municipal policy in one of three ways, either by "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Roach v. City of Evansville*, 111 F.3d 544, 548 (7th Cir. 1997). Consequently, to establish liability against the Village, a Plaintiff must prove that: "(1) he suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the [Village]; which (3) was the proximate cause of his injury." *Ienco v. City of Chicago*, 286 F.3d 994, 998 (7th Cir. 2002).

Plaintiff argues that the Village is liable for failing to adequately train and supervise the Defendant Officers. See Resp. at 24 citing *Kitzman-Kelley v. Warner*, 203 F.3d 454, 459 (7th Cir. 2000). Municipal liability may arise through a policy of inadequate training. *City of Canton*, 489 U.S. at 388. However, before analyzing whether a municipality caused a plaintiff's harm, a court must determine that the harm suffered by the plaintiff was in fact a deprivation of a

federal right.  See *Collins*, 503 U.S. at 120 ("[P]roper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation.").  As this Court has determined that Plaintiff's constitutional rights have not been violated, his claim against the Village fails as a matter of law.  Accordingly, summary judgment is granted on Count V.[14]

### F.      Plaintiff's Claim State Law Claims

In addition to his § 1983 claims, Plaintiff also sued the Defendants under the state law torts of malicious prosecution (Count III) and intentional infliction of emotional distress (Count IV).  Because the Court has granted summary judgment as to all claims (in Counts I, II, and V) over which it has original jurisdiction, it must now address whether to retain jurisdiction over those state law claims.  See 28 U.S.C. § 1367(c)(3)).  The Seventh Circuit consistently has stated that "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."  *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *Alonzi v. Budget Constr. Co.*, 55 F.3d 331, 334 (7th Cir. 1995); *Brazinski v. Amoco Petroleum Additivies  Co.*, 6 F.3d 1176, 1182 (7th Cir. 1993).  Finding no justification for departing from that "usual practice" in this case,[15]

---

[14]  Because the Court has concluded that the Defendant Officers did not violate any of Plaintiff's constitutional rights, it need not discuss Defendants' alternative line of defense that the Defendant Officers are protected by the doctrine of qualified immunity.

[15]  In *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251-53 (7th Cir. 1994), the Seventh Circuit noted that there occasionally are "unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point to a federal decision of the state-law claims on the merits."  The first example that the Court discussed occurs "when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court."  *Id*. at 1251.  That concern is not present here, however, because Illinois law gives Plaintiff one year from the dismissal on jurisdictional grounds of state law claims in federal court in which to refile those claims in state court.  See 735 ILCS 5/13-217; *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008).  Dismissal without prejudice also is appropriate here because substantial judicial resources have

the Court dismisses *without prejudice* the state law claims for malicious prosecution and intentional infliction of emotional distress asserted in Counts III through IV of the complaint. Count VI (Indemnity by Village of Bellwood), which relies on an Illinois statute (745 ILCS 10/9-102) is similarly dismissed without prejudice.

**IV.    Motion to Disqualify Plaintiff's Attorneys and to Strike Affidavit**

Also before the Court is Defendants' motion to strike affidavits pursuant to FRCP 37(c)(1) and motion to disqualify plaintiff's counsel [86]. Defendants take issue with two affidavits submitted in support of Plaintiff's response to Defendants' motion for summary judgment: one signed by John P. DeRose (one of Plaintiff's attorneys) and another signed by J.B. Carr (a neighbor of Elizabeth Graham's).

In his response to Defendants' motion [92], Plaintiff states that he has "no objection to the court disregarding or striking Mr. DeRose's affidavit." Accordingly, Defendants' motion to strike the DeRose affidavit is granted. Defendants also ask the Court to disqualify Plaintiff's attorneys and reopen discovery to allow their depositions because the DeRose affidavit shows that both Mr. DeRose and Mr. Crooks (Plaintiff's other attorney) have "knowledge material to" Plaintiff's *Brady* claims. In part because this Court has granted summary judgment on or dismissed all of Plaintiff's federal law claims (including any *Brady*-type claims), this portion of Defendants' motion is denied.

Last, Defendants ask the court to strike the affidavit of J.B. Carr because Carr was not identified as a witness in Plaintiff's Federal Rule of Civil Procedure 26(a)(1) disclosures and because Defendants had no opportunity to depose Carr. The Carr Affidavit simply states that (1) he a neighbor of and acquainted with Plaintiff's mother and Elizabeth, (2) he is acquainted with

---

not been committed to the state law counts of Plaintiff's complaint. *Wright*, 29 F.3d at 1251. Finally, this is not a circumstance in which "it is absolutely clear how the pendent claims can be decided." *Id.*

both Plaintiff and Ruby, and (3) he as seen Ruby and Plaintiff interacting together in his presence. The affidavit does not say *when* he observed Ruby and Plaintiff interacting. It is undisputed that at some point during Ruby's life, she knew Plaintiff (however she testified that she knew him only by a nickname). (Pl. Resp. Def. SOF ¶ 74). Since the Carr affidavit adds nothing beyond what the Court already has accepted as a fact at least for purposes of this motion, Plaintiff would suffer no prejudice were the Court to strike it. Accordingly, Defendants' motion to strike is granted with respect to the Carr Affidavit. R. 37(c)(1).

**IV.    Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment [70] is granted as to Counts I, II, and V and the remaining state law claims (Counts III, IV, and VI) are dismissed without prejudice. Defendants' motion to strike affidavits and disqualify Plaintiff's counsel [86] is granted in part and denied in part.

Dated:  September 28, 2010

_____
Robert M. Dow, Jr.
United States District Judge